# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | |
|---|---|
| *In Re: LoanCare Data Security Breach Litigation* | Consolidated Case No.:<br>3:23-cv-1508-MMH-MCR<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, Kevin Curry, Gregory Arrowsmith, Namuun Bat, Joshua Dryden, Richard Freire, Andrew Gharibian, Christopher Human, Cody Kettlewood, April Manar, Eisin Jahwer Martinez, Douglas Newell, Jose Peralta, and Ryan Turizo, individually and on behalf of the Class defined below of similarly situated persons, allege the following against Defendants, LoanCare, LLC ("LoanCare") and Fidelity National Financial, Inc. ("FNF"), and ("Defendants"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel as to all other matters:

1.    This case involves the unauthorized breach of FNF's computer networks announced on November 19, 2023, wherein the personal identifiable information ("PII") of LoanCare customers, including full names, addresses, Social Security numbers, and loan numbers, of about 1.3 million individuals was exposed

due to a flaw in FNF's information technology systems, which allowed hackers and other bad actors to obtain individuals' PII for unsavory and illegal purposes (the "Data Breach").

2.    FNF is one of the largest transaction services providers for the real estate and mortgage industries with a market capitalization of approximately $13.3 billion.[1]

3.    FNF is the parent company of LoanCare, which is a sub-servicing and interim sub-servicing provider and a significant player in the mortgage servicing sector, handling approximately $390 billion in balances from over a million loans.[2]

4.    As a loan servicing company, LoanCare is responsible for processing loan payments, handling escrow accounts, and generally managing customers' mortgages. In order to obtain LoanCare's services, customers are required to entrust LoanCare with their PII, which LoanCare uses in order to perform its regular loan servicing activities. Upon information and belief, the PII customers entrust to LoanCare is ultimately stored in FNF's information technology network.

---

[1] Bill Toulas, *Mortgage firm LoanCare warns 1.3 million people of data breach*, BLEEPINGCOMPUTER (Dec. 27, 2023), https://www.bleepingcomputer.com/news/security/mortgage-firm-loancare-warns-13-million-people-of-data-breach/ (last visited Mar. 5, 2024).

[2] *Id.*

5.      As financial services companies, Defendants therefore knowingly collect and store sensitive customer PII, and have a resulting duty to secure such information from unauthorized access.

6.      This Consolidated Class Action Complaint is filed on behalf of all affected persons in the United States, described more fully in the following sections, whose PII was compromised in the Data Breach.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of Class Members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

8.      This Court has general personal jurisdiction over Defendants because they are citizens of the state of Florida.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in this District, a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District; Defendants conduct substantial business within this District; and Defendants have harmed Class Members residing in this District.

## PARTIES

### A. Plaintiffs

### Plaintiff Kevin Curry

10.    Plaintiff Kevin Curry is an adult individual and citizen of North Carolina.

11.    Plaintiff Kevin Curry is a LoanCare customer, and upon information and believe, provided his PII –including his name, address, and Social Security number—to Defendant LoanCare as a condition of receiving loan subservicing. His PII was then stored and maintained by FNF.

12.    Plaintiff Curry received a letter from LoanCare notifying him of the Data Breach and of the unauthorized exposure of his PII.

13.    Plaintiff Curry is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

14.    As a direct and proximate result of the Data Breach, Plaintiff Curry has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

15.    As a result of the Data Breach, Plaintiff Curry received a dark web notification notice and was notified that his address was falsely posted on Experian credit monitoring.

16.    As a result of the Data Breach, Plaintiff Curry has had to spend approximately 1 to 2 hours dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, and monitoring his accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced stress and anxiety as a result of the Data Breach.

17.    As a result of the Data Breach, Plaintiff Curry spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

**Plaintiff, Gregory Arrowsmith**

18.    Plaintiff Gregory Arrowsmith is an adult individual and citizen of California.

19.    Plaintiff Arrowsmith is a LoanCare customer, and upon information and belief, provided his PII—including his name, address, and Social Security number—to Defendants as a condition of receiving loan subservicing. His PII was then stored and maintained by FNF.

20.     Plaintiff Arrowsmith received a letter from LoanCare notifying him of the Data Breach and of the unauthorized exposure of his PII.

21.     Plaintiff Arrowsmith is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

22.     As a direct and proximate result of the Data Breach, Plaintiff Arrowsmith has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

23.     As a result of the Data Breach, Plaintiff Arrowsmith has had to spend approximately 1 to 2 hours dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, and monitoring his accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced stress and anxiety as a result of the Data Breach.

24.     As a result of the Data Breach, Plaintiff Arrowsmith anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

**Plaintiff, Namuun Bat**

25.     Plaintiff Namuun Bat is an adult individual and citizen of California.

26.     Plaintiff Bat is a LoanCare customer, and upon information and belief, provided her PII—including her name, address, and Social Security number—to Defendants as a condition of receiving loan subservicing. Her PII was then stored and maintained by FNF.

27.     Plaintiff Bat received a letter from LoanCare notifying her of the Data Breach and of the unauthorized exposure of her PII.

28.     Since the Data Breach, Plaintiff Bat was notified there was an incorrect entry on her credit report, and that the address and phone number were changed on her LoanCare online account. A fraudulent actor had signed documents stating "Do not contact" so that Namuun would not be notified. She implemented a credit freeze.

29.     Plaintiff Bat is very careful about sharing sensitive PII. She stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendants had she known of Defendants' lax data security policies.

30.     As a direct and proximate result of the Data Breach, Plaintiff Bat has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring her financial accounts.

31.     As a result of the Data Breach, Plaintiff Bat has had to spend approximately 4-5 hours each week dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, dealing with the fraud on her credit report and LoanCare account including freezing her credit through all three bureaus, spending hours talking to LoanCare on the phone and filing a police report, and monitoring her accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. She has experienced stress and anxiety as a result of the Data Breach and ensuing fraud.

32.     As a result of the Data Breach, Plaintiff Bat anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. She has faced and faces a present and continuing risk of fraud and identity theft for her lifetime.

### Plaintiff, Joshua Dryden

33.     Plaintiff Joshua Dryden is an adult individual and citizen of Texas.

34.     Plaintiff Dryden is a LoanCare customer, and upon information and belief, provided his PII—including his name, address, and Social Security

number—to Defendants as a condition of receiving loan subservicing. His PII was then stored and maintained by FNF.

35.    Plaintiff Dryden received a letter from LoanCare notifying him of the Data Breach and of the unauthorized exposure of his PII.

36.    After the Data Breach, Plaintiff Dryden twice experienced unauthorized charges on his credit card, and he had to cancel the card and order a new one, and he also had an incorrect charge on his PayPal account.

37.    Plaintiff Dryden is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

38.    As a direct and proximate result of the Data Breach, Plaintiff Dryden has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

39.    As a result of the Data Breach, Plaintiff Dryden has had to spend at least 40 hours dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, calling his bank, PayPal, and the credit bureaus, and monitoring his accounts and credit reports to

detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced stress, fear, and anxiety as a result of the Data Breach.

40.    As a result of the Data Breach, Plaintiff Dryden anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

### Plaintiff, Richard Freire

41.    Plaintiff Richard Freire is an adult individual and citizen of Florida.

42.    Plaintiff Freire is a LoanCare customer, and upon information and belief, provided his PII—including his name, address, and Social Security number—to Defendants as a condition of receiving loan subservicing. His PII was then stored and maintained by FNF.

43.    Plaintiff Freire is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

44.    As a direct and proximate result of the Data Breach, Plaintiff Freire has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

45.    As a result of the Data Breach, Plaintiff Freire has had to spend approximately 6 to 8 hours dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, and monitoring his accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced stress and anxiety as a result of the Data Breach.

46.    As a result of the Data Breach, Plaintiff Freire anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

## Plaintiff, Andrew Gharibian

47.    Plaintiff Andrew Gharibian is an adult individual and citizen of California.

48.    Plaintiff Gharibian is a customer of a loan servicer which LoanCare services, and upon information and belief, provided his PII—including his name, address, and Social Security number—to LoanCare as a condition of receiving loan subservicing. His PII was then stored and maintained by FNF.

49.    Plaintiff Gharibian received a letter from LoanCare notifying him of the Data Breach and of the unauthorized exposure of his PII.

50.    Plaintiff Gharibian is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

51.    As a direct and proximate result of the Data Breach, Plaintiff Gharibian has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

52.    As a result of the Data Breach, Plaintiff Gharibian has had to spend approximately 8 hours each week dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, and monitoring his accounts, credit reports, and the dark web to detect suspicious and fraudulent activity to mitigate against potential harm. He has spent time on the phone with Defendants to learn about the breach. He has experienced stress and anxiety as a result of the Data Breach.

53.    As a result of the Data Breach, Plaintiff Gharibian anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

## Plaintiff, Christopher Human

54.    Plaintiff Christopher Human is an adult individual and citizen of North Carolina.

55.    Plaintiff Human is a LoanCare customer, and upon information and belief, provided his PII—including his name, address, and Social Security number—to Defendants as a condition of receiving loan subservicing. His PII was then stored and maintained by FNF.

56.    Plaintiff Human received a letter from LoanCare notifying him of the Data Breach and of the unauthorized exposure of his PII.

57.    After the Data Breach, Plaintiff Human experienced identity fraud in the form of someone opening bank accounts in his name at multiple banks by using his Social Security number. $10,000 was stolen from one of his bank accounts, and was found in one of the fraudulent accounts, but he still has not been reimbursed for the money. This caused him to freeze all his bank accounts except for one. In March 2024, an unauthorized individual attempted to access the bank account that was not frozen.

58.    Plaintiff Human is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of

Defendants' lax data security policies. He has never previously had issues with fraudulent opening of bank accounts or any other type of identity fraud.

59.     As a direct and proximate result of the Data Breach, Plaintiff Human has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

60.     As a result of the Data Breach, Plaintiff Human has had to spend over 40 hours so far dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, calling his bank, disputing charges and fraudulent accounts, calling the Social Security Administration, freezing his credit, and monitoring his accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced constant stress and anxiety as a result of the Data Breach.

61.     As a result of the Data Breach, Plaintiff Human anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

**Plaintiff, Cody Kettlewood**

62.     Plaintiff Cody Kettlewood is an adult individual and citizen of Delaware.

63.     Plaintiff Kettlewood is a LoanCare customer, and upon information
and belief, provided his PII—including his name, address, and Social Security
number—to Defendants as a condition of receiving loan subservicing. His PII was
then stored and maintained by FNF.

64.     Plaintiff Kettlewood received a letter from LoanCare notifying him of
the Data Breach and of the unauthorized exposure of his PII.

65.     Plaintiff Kettlewood is very careful about sharing sensitive PII. He
stores documents containing PII in safe and secure locations and has never
knowingly transmitted unencrypted sensitive PII over the internet or any other
unsecured source. Plaintiff would not have entrusted his PII to Defendants had he
known of Defendants' lax data security policies.

66.     As a direct and proximate result of the Data Breach, Plaintiff
Kettlewood has made reasonable efforts to mitigate the impact of the Data Breach,
including by regularly and closely monitoring his financial accounts.

67.     As a result of the Data Breach, Plaintiff Kettlewood has had to spend
more than 10 hours dealing with the consequences of the Data Breach, including
researching the potential consequences of the Data Breach, and monitoring his
accounts and credit reports to detect suspicious and fraudulent activity to mitigate
against potential harm. He has experienced frustration, stress, and anxiety as a
result of the Data Breach.

68.    As a result of the Data Breach, Plaintiff Kettlewood anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

**Plaintiff, April Manar**

69.    Plaintiff April Manar is an adult individual and citizen of Missouri.

70.    Plaintiff Manar is a LoanCare customer, and upon information and belief, provided her PII—including her name, address, and Social Security number—to Defendants as a condition of receiving loan subservicing. Her PII was then stored and maintained by FNF.

71.    Plaintiff Manar received a letter from LoanCare notifying her of the Data Breach and of the unauthorized exposure of his PII.

72.    After the Data Breach, Plaintiff Manar experienced fraudulent Medicare charges on her statement amounting to $8,000 for catheters in New Jersey.

73.    Plaintiff Manar is very careful about sharing sensitive PII. She stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had she known of Defendants' lax data security policies.

74.    As a direct and proximate result of the Data Breach, Plaintiff Manar has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring her financial accounts.

75.    As a result of the Data Breach, Plaintiff Manar has had to spend over 10 hours dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, calling LoanCare and FNF, and monitoring her accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. She has experienced stress and anxiety as a result of the Data Breach.

76.    As a result of the Data Breach, Plaintiff Manar anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. She has faced and faces a present and continuing risk of fraud and identity theft for her lifetime.

**Plaintiff, Eisin Jahwer Martinez**

77.    Plaintiff Eisin Jahwer Martinez is an adult individual and citizen of New Jersey.

78.    Plaintiff Martinez is a LoanCare customer, and upon information and belief, provided his PII—including his name, address, and Social Security number—to Defendants as a condition of receiving loan subservicing. His PII was then stored and maintained by FNF.

79.    Plaintiff Martinez received a letter from LoanCare notifying him of the Data Breach and of the unauthorized exposure of his PII.

80.    Plaintiff Martinez is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

81.    As a direct and proximate result of the Data Breach, Plaintiff Martinez has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

82.    As a result of the Data Breach, Plaintiff Martinez has had to spend approximately 3 hours daily dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, changing online passwords, and monitoring his accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced stress, anxiety, and worry about his credit score as a result of the Data Breach.

83.    As a result of the Data Breach, Plaintiff Martinez anticipates spending considerable time and money on an ongoing basis to try to mitigate and address

the harms caused by the Data Breach. He has faced and faces a present and
continuing risk of fraud and identity theft for his lifetime.

## Plaintiff, Douglas Newell

84.    Plaintiff Douglas Newell is an adult individual and citizen of
Louisiana.

85.    Plaintiff Newell is a LoanCare customer, and upon information and
belief, provided his PII—including his name, address, and Social Security
number—to Defendants as a condition of receiving loan subservicing. His PII was
then stored and maintained by FNF.

86.    Plaintiff Newell received a letter from LoanCare notifying him of the
Data Breach and of the unauthorized exposure of his PII.

87.    Plaintiff Newell is very careful about sharing sensitive PII. He stores
documents containing PII in safe and secure locations and has never knowingly
transmitted unencrypted sensitive PII over the internet or any other unsecured
source. Plaintiff would not have entrusted his PII to Defendants had he known of
Defendants' lax data security policies.

88.    As a direct and proximate result of the Data Breach, Plaintiff Newell
has made reasonable efforts to mitigate the impact of the Data Breach, including
by regularly and closely monitoring his financial accounts.

89.     As a result of the Data Breach, Plaintiff Newell has had to spend approximately 4 to 5 hours each week dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, and monitoring his accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced stress and anxiety as a result of the Data Breach.

90.     As a result of the Data Breach, Plaintiff Newell anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

### Plaintiff, Jose Peralta

91.     Plaintiff Jose Peralta is an adult individual and citizen of California.

92.     Plaintiff Peralta is a LoanCare customer, and upon information and belief, provided his PII—including his name, address, and Social Security number—to Defendants as a condition of receiving loan subservicing. His PII was then stored and maintained by FNF.

93.     Plaintiff Peralta received a letter from LoanCare notifying him of the Data Breach and of the unauthorized exposure of his PII.

94.     After the Data Breach, he experienced identity fraud in the form of unauthorized charges on his credit card account, and a second Uber account under his name and financial information that he did not create.

95.     Plaintiff Peralta is very careful about sharing sensitive PII. He stores documents containing PII in safe and secure locations and has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

96.     As a direct and proximate result of the Data Breach, Plaintiff Peralta has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

97.     As a result of the Data Breach, Plaintiff Peralta has had to spend approximately 20 hours dealing with the consequences of the Data Breach, including researching the potential consequences of the Data Breach, disputing the fraudulent charges, and monitoring his accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced stress and anxiety as a result of the Data Breach.

98.     As a result of the Data Breach, Plaintiff Peralta anticipates spending considerable time and money on an ongoing basis to try to mitigate and address

the harms caused by the Data Breach. He has faced and faces a present and
continuing risk of fraud and identity theft for his lifetime.

**Plaintiff, Ryan Turizo**

99.    Plaintiff Ryan Turizo is an adult individual and citizen of Florida.

100.    Plaintiff Turizo is a LoanCare customer, and upon information and
belief, provided his PII—including his name, address, and Social Security
number—to Defendants as a condition of receiving loan subservicing. His PII was
then stored and maintained by FNF.

101.    Plaintiff Turizo received a letter from LoanCare notifying him of the
Data Breach and of the unauthorized exposure of his PII.

102.    Plaintiff Turizo is very careful about sharing sensitive PII. He stores
documents containing PII in safe and secure locations and has never knowingly
transmitted unencrypted sensitive PII over the internet or any other unsecured
source. Plaintiff would not have entrusted his PII to Defendants had he known of
Defendants' lax data security policies.

103.    As a direct and proximate result of the Data Breach, Plaintiff Turizo
has made reasonable efforts to mitigate the impact of the Data Breach, including
by regularly and closely monitoring his financial accounts.

104.    As a result of the Data Breach, Plaintiff Turizo has had to spend
approximately 6 to 8 hours dealing with the consequences of the Data Breach,

including researching the potential consequences of the Data Breach, and monitoring his accounts and credit reports to detect suspicious and fraudulent activity to mitigate against potential harm. He has experienced stress and anxiety as a result of the Data Breach.

105.    As a result of the Data Breach, Plaintiff Turizo anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

## B. Defendants

106.    Defendant LoanCare is a limited liability company formed and existing under the laws of Delaware with its headquarters and principal place of business at 3673 Sentara Way, Virginia Beach, Virginia 23452.

107.    Defendant FNF is a corporation formed and existing under the laws of Delaware with its headquarters and principal place of business at 601 Riverside Ave., Building 5, Jacksonville, Florida 32204.

108.    Upon information and belief, LoanCare is a direct, wholly-owned subsidiary of ServiceLink NLS, LLC, which is a direct, wholly-owned subsidiary of ServiceLink Holdings, Inc., which is a direct, wholly-owned subsidiary of FNF. LoanCare is a citizen of each state in which one of its members is a citizen. Therefore, LoanCare is a citizen of the states of Delaware and Florida.

## FACTUAL ALLEGATIONS

**A.    Defendants Provide Financial Services Involving Highly Sensitive Data.**

109.    FNF, the nation's largest title insurance company through its various underwriters (Fidelity National Title, Chicago Title, Commonwealth Land Title, Alamo Title, and National Title of New York), and provides a myriad of services to the real estate and mortgage industries, including closing and escrow services, and other title-related services.[3]

110.    Through its subsidiary companies, FNF provides additional services, including mortgage and real estate services, real estate technology, and annuities and life insurance. One such FNF subsidiary is LoanCare.

111.    LoanCare "is a nationally recognized leader in full-service subservicing to the mortgage industry."[4] For 40 years, LoanCare "has been servicing mortgage loans for banks, credit unions, and independent mortgage companies."[5]

---

[3] *About Us*, FIDELITY NATIONAL FINANCIAL, https://fnf.com/who-we-are#About%20Us (last visited Mar. 5, 2024); *Company Overview*; FIDELITY NATIONAL FINANCIAL, https://www.investor.fnf.com/ (last visited Mar. 5, 2024).
[4] *Mortgage & Real Estate Services*, FIDELITY NATIONAL FINANCIAL, https://fnf.com/companies/mortgage-real-estate-services/#LoanCare (last visited Mar. 5, 2024).
[5] *About Us*, LOANCARE, https://myloancare.com/web/about-us (last visited Mar. 5, 2024).

112.    LoanCare says it "is a subservicing partner solely focused on you achieving homeownership in the years following mortgage loan origination. [It does] this through a specialized team of experts in escrow, payments, taxes, insurance and more to support you along the way."[6]

113.    LoanCare "services and subservices mortgage loans secured primarily by residential real estate throughout the United States."[7]

114.    In the course of providing its loan servicing solutions, LoanCare subservices more than 1.8 million loans nationwide, totaling over $389 billion in unpaid principal balances.[8]

115.    As part of conducting its loan servicing solutions to other financial institutions, LoanCare is entrusted with mortgage customers' sensitive PII, including but not limited to individuals' names, addresses, Social Security Numbers, and loan numbers.

116.    Upon information and belief, the PII LoanCare is entrusted with is ultimately stored on FNF's information technology network.

---

[6] *Id.*

[7] FNF National Financial, Inc., *Form 10-K for Fiscal Year Ended Dec. 31, 2022*, https://www.investor.fnf.com/static-files/09f88722-9b4f-46e1-8a78-88826d6d5968, at 36.

[8] *Id.*

## B.    The Data Breach.

117.    On or about November 19, 2023, FNF announced that it had been impacted by a "cybersecurity incident."[9]

118.    News articles reported that in response to the cybersecurity incident, FNF "decided to shut down their network, systems, and even their email […] in an attempt to scrub their servers in Jacksonville and prevent any issues."[10]

119.    "This virtually froze all the company and its subsidiaries' activities, leaving people buying and selling homes, or paying mortgages, confused and uncertain of what was going to happen to their properties and money."[11]

120.    LoanCare itself called the cybersecurity incident a "catastrophe" in an automated message played to anyone who called its customer support number.[12]

121.    And shortly after the cybersecurity incident, "the ransomware gang known as ALPHV (or BlackCat) claimed responsibility for the cyberattack on FNF in a message posted on the gang's official dark web site."[13]

---

[9] Lorenzo Franceschi-Bicchierai, *FNF National Financial shuts down network in wake of cybersecurity incident*, TECHCRUNCH (Nov. 22, 2023), https://techcrunch.com/2023/11/22/fidelity-national-financial-shuts-down-network-in-wake-of-cybersecurity-incident/.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

122.    The BlackCat hackers then purportedly issued a ransom demand to Defendants. However, Defendants have provided no public information on the ransom demand or payment. On information and belief, BlackCat is anticipated to release all stolen information onto the dark web for access, sale, and download following the deadline of the ransom demand to Defendants.[14]

123.    Approximately one month later, on or about December 20, 2023, LoanCare filed a notice of data breach ("Notice") with the Attorney General of Maine indicating that the cybersecurity incident was really a cyber-attack resulting in the exfiltration of data by a third party that had occurred on or about November 19, 2023.[15]

124.    LoanCare has provided minimal information about the Data Breach, describing the circumstances surrounding the Data Breach as follows:

> On or about November 19, 2023, LoanCare, LLC ("LoanCare"), which performs or has performed loan subservicing functions for your mortgage loan servicer, became aware of unauthorized access to certain systems within its parent's, Fidelity National Financial, Inc. ("FNF"), information technology network. Upon becoming aware of the incident, FNF commenced an investigation with the assistance of third-party experts, notified certain law enforcement and governmental authorities, and began taking measures to assess and contain the incident. The incident has been contained.

---

[14] *See* Cybersecurity & Infrastructure Security Agency, *Security Advisory: #StopRansomware: ALPHV Blackcat* (Feb. 27, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-353a (last visited Mar. 5, 2024).

[15] *Data Breach Notifications*, OFFICE OF THE MAIN ATT'Y GEN., https://apps.web.maine.gov/online/aeviewer/ME/40/25bd9abc-608b-4a8a-8f35-ba5413b9399f.shtml (last visited Mar. 5, 2024) ("Notice").

The investigation has determined that an unauthorized third party exfiltrated data from certain FNF systems.[16]

125.    Once able to access LoanCare's systems, these malicious third-party hackers stole information including, *inter alia*, individuals' full names, addresses, Social Security numbers, and loan numbers.[17]

126.    In a regulatory filing on or about January 9, 2024, FNF later reported that it was able to determine "that an unauthorized third-party accessed certain FNF systems, deployed a type of malware that is not self-propagating, and exfiltrated certain data."[18]

127.    Based on Defendants' statements, it is evident that the bad actors accessed Defendants' computer systems in an intentional attack designed to acquire customers' valuable PII stored therein, and that the bad actors were successful in the attack.

128.    As a result of the Data Breach, the PII of approximately 1.3 million individuals—including Plaintiffs and Class Members—was exfiltrated and is now in the hands of cybercriminals.[19]

---

[16] *Id.*

[17] Toulas, *supra* n.1.

[18] *Id.*

[19] *Id.*

129.    Omitted from the Notice Letter are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the specific remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs or Class Members, who retain a vested interest in ensuring that their PII remains protected.

130.    Thus, Defendants' "disclosure" of the Data Breach amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

131.    In addition, Defendants do not make promises to customers about implementing additional safeguards and security to prevent future data breaches. Instead, Defendants place the onus on Plaintiffs, merely instructing them to review "further steps you can take" and to call Defendants' listed number for any further questions.[20]

132.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

---

[20] Notice.

133.    The attacker accessed and acquired files containing unencrypted PII of Plaintiffs and Class Members, including their names, dates of birth, and Social Security numbers. Plaintiffs' and Class Members' PII was accessed and stolen in the Data Breach.

134.    Plaintiffs further believe their PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type. Moreover, following the Data Breach, Plaintiffs experienced fraudulent misuse of their compromised information that would support this well-founded belief.

**C.    Defendants Obtain, Collect, and Store Plaintiffs' and Class Members' PII.**

135.    In the ordinary course of doing business with its customers, LoanCare regularly requires Plaintiffs and Class Members to provide LoanCare their PII, which in turn is stored on FNF's information technology network. This information includes:

      a.    Contact information (*e.g.*, name, address, phone number, email address);

      b.    Demographic information (*e.g.*, date of birth, gender, marital status);

      c.    Identity information (*e.g.*, Social Security number, driver's license, passport, or other government ID number);

      d.     Financial account information (*e.g.*, loan or bank account information); and

      e.     Other personal information necessary to provide products or services.

136.    Cybercriminals need not harvest every individual piece of information on a consumer from one data breach to commit identity fraud or misuse PII. They can cross-reference the data stolen from this Data Breach and combine it with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs and Class Members.

137.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from unauthorized access, compromise, and exfiltration.

138.    Defendants expressly recognize these duties, representing that they are "committed to protecting [customers'] privacy" and further stated that "[w]e maintain physical, electronic, and procedural safeguards to protect your information."[21]

---

[21]    *Fidelity National Financial Privacy Notice*, LOANCARE, https://www.loancareservicing.com/privacy-policy/ (last visited Mar. 5, 2024).

139.    Plaintiffs and Class Members reasonably expect that financial service providers such as Defendants will use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

140.    Plaintiffs and Class Members had a reasonable expectation, based in part on Defendants' own statements, that their sensitive personal information would be protected. However, despite Defendants' stated commitment to data security, Defendants failed to adopt reasonable measures to prevent the unauthorized access to Plaintiffs' and Class Members' PII and allowed for the release of said information to unauthorized bad actors.

141.    Had Defendants properly maintained their information technology network and worked diligently to correct vulnerabilities, remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants could have prevented intrusion into their information technology network and, ultimately, the theft of Plaintiffs' and Class Members' confidential PII.

## D. The Value of PII and Effects of Unauthorized Disclosure

142.    Defendants were well-aware that the protected PII which they acquire is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

143.    Defendants also knew that a breach of their computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

144.    These risks are not theoretical -- numerous high-profile breaches have occurred at financial services companies such as CapitalOne, KeyBank, Equifax, Flagstar Bank, and TMX Finance Corporate Services in recent years.

145.    PII is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[22] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

_____

[22] *What To Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021),         https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed Mar. 5, 2024).

146.    Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available.

147.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[23]

148.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[24]

---

[23] *Data Breach Report: 2021 Year End*, RISK BASED SECURITY (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[24] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, INS. INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20.

149.    The financial sector is also a prime target for threat actors. Between January 2018 and September 2023, financial companies have suffered 2,260 data breaches, impacting over 232 million records.[25]

150.    The financial sector is "disproportionately targeted by threat actors" because of a simple rational: "[t]hreat actors target organizations that have what they want and what pays big – data and money. Data can be sold for money and vulnerabilities that enable access to both data and money."[26]

151.    Indeed, "[h]acking financial organizations can potentially allow malicious threat actors to access accounts or personal information that can help a criminal gain unauthorized access and make financial transactions or trick others into revealing more information and sending them money."[27]

152.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class

---

[25] Paul Bischoff, *Financial data breaches accounted for 232 million leaked records from January 2018 to September 2023*, Comparitech (Oct. 4, 2023), https://www.comparitech.com/blog/vpn-privacy/financial-data-breaches/#:~:text=2%2C260%20financial%20data%20breaches%20 from,over%20101%20million%20in%20total.

[26] Jen Miller-Osborn, *3 Reasons Cyberattacks Target Financial Services and How to Fight Back*, PALOALTO NETWORK (Aug. 31, 2021), https://www.paloaltonetworks.com/ blog/2021/08/financial-services-cyberattacks/.

[27] Kyle Chin, *Why is the Finance Sector a Target for Cyber Attacks?*, UPGUARD (Aug. 21, 2023), https://www.upguard.com/blog/finance-sector-cyber-attacks#:~:text=Hacking%20financial%20organizations%20can%20potentially,information%20and%20sending%20them%20money.

Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

153.    Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

154.    The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your

new number, the absence of any credit history under the new number
may make more difficult for you to get credit.[28]

155.    Social Security numbers allow individuals to apply for credit cards,
student loans, mortgages, and other lines of credit—among other services. Often
social security numbers can be used to obtain medical goods or services, including
prescriptions. They are also used to apply for a host of government benefits.
Access to such a wide range of assets makes social security numbers a prime target
for cybercriminals and a particularly attractive form of PII to steal and then sell.

156.    The ramifications of Defendants' failure to keep Plaintiffs' and Class
Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use
of that information and damage to victims may continue for years.

157.    A data breach increases the risk of becoming a victim of identity theft.
Victims of identity theft can suffer from both direct and indirect financial losses.
According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained
> from misusing the victim's account or personal information,
> including the estimated value of goods, services, or cash obtained. It
> includes both out-of-pocket loss and any losses that were reimbursed
> to the victim. An indirect loss includes any other monetary cost
> caused by the identity theft, such as legal fees, bounced checks, and
> other miscellaneous expenses that are not reimbursed (e.g., postage,

---

[28] Social Security Administration, *Identify Theft and Your Social Security Numbers*,
(June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[29]

158.    Even if stolen PII does not include financial or payment card account information does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

159.    A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[30]

---

[29] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited Mar. 5, 2024).
[30] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

160.   Due to high-profile data breaches at other companies, Defendants knew or should have known that their information technology system would be targeted by cybercriminals.

161.   Defendants also knew or should have known the importance of safeguarding the PII with which they were entrusted and of the foreseeable consequences if its data security systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of its customers' PII from occurring.

**E. Defendants Failed to Comply with the FTCA and Failed to Observe Reasonable and Adequate Data Security Measures.**

162.   The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[31]

163.   Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information;

---

[31] *Start With Security*, FTC, https://www.ftc.gov/ system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[32]

164.    The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

165.    The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[33]

166.    The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders originating from these actions

---

[32] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/ system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Mar. 5, 2024).
[33] *Supra* n.31.

further elucidate the measures businesses must take to satisfy their data security obligations.

167.    FNF's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

168.    Plaintiffs and Class Members gave their PII to LoanCare with the reasonable expectation and understanding that LoanCare would comply with its duty to keep such information confidential and secure from unauthorized access.

169.    Defendants have been on notice for years that Plaintiffs' and Class Members' PII was a target for bad actors because of, among other motives, the high value of the PII created, collected, and maintained by Defendants.

170.    Despite such awareness, Defendants failed to impose and maintain reasonable and appropriate data security controls to protect Plaintiffs' and Class Members' PII from unauthorized access that Defendants should have anticipated and guarded against.

171.    FNF was fully aware of its obligation to protect the PII of its current and former customers because of its collection, storage, and maintenance of PII. FNF was also aware of the significant consequences that would ensue if it failed to do so because it collected, stored, and maintained sensitive private information

from millions of individuals and knew that this information, if hacked, would result in injury to Plaintiffs and Class Members.

172.    LoanCare was also fully aware of its obligation to protect the PII of its current and former customers because of its collection, storage, and maintenance of PII. LoanCare was aware of the significant consequences that would ensue if it failed to do so because it collected, stored, and maintained sensitive private information from thousands of individuals and knew that this information, if hacked, would result in injury to Plaintiffs and Class Members.

173.    Despite understanding the consequences of insufficient data security, Defendants failed to adequately protect Plaintiffs' and Class Members' PII, permitting bad actors to access and misuse it.

**F.  Defendants Failed to Comply with Industry Standards.**

174.    Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend

against those cyber-attacks.[34] All organizations collecting and handling PII, such as Defendants, are strongly encouraged to follow these controls.

175.    Further, the CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any governance and security initiative, including PCI DSS, HIPAA, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.[35]

176.    Several best practices have been identified that a minimum should be implemented by data management companies like FNF, including but not limited to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, and securing application software.[36]

177.    Defendants failed to follow these and other industry standards to adequately protect the PII of Plaintiffs and Class Members.

---

[34] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Mar. 5, 2024).
[35] *See* Center for Internet Security, *CIS Benchmarks FAQ*, https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/ (last visited Mar. 5, 2024).
[36] *See supra* n.34.

### G. The Data Breach Has Caused Harm and Will Result in Additional Fraud.

178.   Without detailed disclosure to the victims of the Data Breach, individuals whose PII was compromised by the Data Breach, including Plaintiffs and Class Members, were unknowingly and unwittingly exposed to continued misuse and ongoing risk of misuse of their PII for months without being able to take available precautions to prevent imminent harm.

179.   The ramifications of FNF's failure to secure Plaintiffs' and Class Members' data are severe.

180.   Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes. This conclusion is based on an analysis of four years of data that correlated each year's data breach victims with those who also reported being victims of identity fraud.

181.   The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[37] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[38]

---

[37] 17 C.F.R § 248.201 (2013).

[38] *Id*.

182.    Identity thieves can use PII, such as that of Plaintiffs and Class Members, which Defendants failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

183.    As demonstrated herein, these and other instances of fraudulent misuse of the compromised PII has already occurred and are likely to continue.

184.    As a result of FNF's delay between the Data Breach in August and the notice of the Data Breach sent to affected persons in November, the risk of fraud for Plaintiffs and Class Members increased exponentially.

185.    Javelin Strategy and Research reports that identity thieves have stolen $112 billion in the past six years.[39]

186.    Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics

---

[39]    *See*    https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point (last visited Mar. 5, 2024).

("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[40]

187.    There may be a time lag between when harm occurs versus when it is discovered, and also between when private information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[41]

188.    Thus, Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

**H. Defendants are Subject to, and Failed to Comply with, the GLBA.**

189.    The Gramm-Leach-Bliley Act ("GLBA"), states that "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

---

[40] Bureau of Justice Statistics, *Victims of Identity Theft* (Sept. 2015), http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Mar. 5, 2024).
[41] GAO, *Report to Congressional Requesters*, at 29 (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited Mar. 5, 2024).

190.    A "financial institution" is defined as "any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12." 15 U.S.C. § 6809(3)(A). Defendants are considered financial institutions for purposes of the GLBA as Defendants offer consumers financial products and/or services loans.[42] *See* 12 U.S.C. § 1843(k)(4).

191.    "Nonpublic personal information" means "personally identifiable financial information provided by a consumer to a financial institution; resulting from any transaction with the consumer or any service performed for the consumer; or otherwise obtained by the financial institution." 15 U.S.C. § 6809(4)(A)(i)–(iii). The PII involved in the Data Breach constitutes "nonpublic personal information" for purposes of the GLBA.

192.    Defendants collect "nonpublic personal information," as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) & 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Defendants were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq.*, and are subject to numerous rules and regulations promulgated under the GLBA.

---

[42] Defendants acknowledge that they are subject to the GLBA. *See* Fidelity National Financial, *Code of Business Conduct & Ethics* (Feb. 2023), https://www.investor.fnf.com/static-files/0a78d41c-b0d8-4fc6-847a-dab5340915ac, at 9 (acknowledging "[t]he Safeguards Rule, implemented as part of the Gramm-Leach-Bliley Act, and other federal and state laws and regulations provide specific guidelines regarding the privacy, protection and security of customers' personally identifiable information").

193.    The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more customers to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 & 314.4. As alleged herein, Defendants violated the Safeguards Rule.

194.    Defendants' conduct resulted in a variety of failures to follow GLBA mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that Defendants

failed to implement (or inadequately implemented) information security policies or procedures such as effective customer training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to protect the confidentiality of the PII they maintained in their information technology network.

195.    Had Defendants implemented data security protocols, the consequences of the Data Breach could have been avoided, or at least significantly reduced as the Data Breach could have been detected earlier, the amount of PII compromised could have been greatly reduced.

## I.    Plaintiffs and Class Members Suffered Damages.

196.    The Data Breach was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including FNF's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

197.    Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security

measures recommended by experts in the field, they would have prevented intrusion into its information storage and security systems and, ultimately, the theft of the PII of over 1.3 million individuals.

198.    As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class Members have already been harmed by the fraudulent misuse of their PII, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives. Such mitigatory actions include, *inter alia*, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, sorting through dozens of phishing and spam email, text, and phone communications, and filing police reports. This time has been lost forever and cannot be recaptured.

199.    Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class Members' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.  theft and misuse of their personal and financial information;

b.  the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and misused via the sale of Plaintiffs' and Class Members' information on the Internet's black market;

c.  the untimely and inadequate notification of the Data Breach;

d.  the improper disclosure of their PII;

e.  loss of privacy;

f.  ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

g.  ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market; and,

h.  the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience,

nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

200.   Also of significant concern to Plaintiffs, FNF continues to possess Plaintiffs' and Class Members' PII. Particularly because Defendants have demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiffs and Class Members have an undeniable interest in ensuring that their PII is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

201.   Plaintiffs bring this class action individually on behalf of themselves and on behalf of all members of the following Classes of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the following Classes:

### Nationwide Class

All persons residing in the United States whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

### California Subclass

All persons residing in the state of California whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

### Florida Subclass

All persons residing in the state of Florida whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

202.    Excluded from the Classes are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendants have a controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

203.    Plaintiffs reserve the right to modify or amend the foregoing class definitions before the Court determines whether certification is appropriate.

204.    <u>Numerosity:</u> The members in the Classes are so numerous that joinder of all Class Members in a single proceeding would be impracticable. As noted above, it has been reported that approximately 1.3 million individuals' information was exposed in the Data Breach.

205.    <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

    a.    Whether Defendants engaged in the conduct alleged herein;

    b.    Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' PII from unauthorized access and disclosure;

c.    Whether Defendants' computer systems and data security practices used to protect Plaintiffs' and Class Members' PII violated the FTCA and/or the GLBA and/or state laws, and/or Defendants' other duties discussed herein;

d.    Whether FNF failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and Class Members;

e.    Whether Defendants unlawfully shared, lost, or disclosed Plaintiffs' and Class Members' PII;

f.    Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g.    Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

h.    Whether Plaintiffs and Class Members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

i. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' PII;

j. Whether Defendants breached duties to protect Plaintiffs' and Class Members' PII;

k. Whether Defendants' actions and inactions alleged herein were negligent;

l. Whether Defendants were unjustly enriched by their conduct as alleged herein;

m. Whether an implied contract existed between Class Members and Defendants with respect to protecting PII and privacy, and whether that contract was breached;

n. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

o. Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

p. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

206.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

207.    <u>Typicality:</u> Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs, like all proposed Class Members, had their PII compromised in the Data Breach. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

208.    <u>Adequacy:</u> Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Classes and have no interests adverse to, or conflict with, the Class(es) they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

209.    <u>Superiority:</u> A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and all other Class Members are relatively small compared to the burden and expense that would be required

to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

210. <u>Injunctive and Declaratory Relief:</u> Defendants have acted and/or refused to act on grounds generally applicable to the Classes such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Classes as a whole.

211. All members of the proposed Classes are readily ascertainable. Defendants have access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach. Indeed, impacted Class Members already have been preliminarily identified and sent a breach notice letter.

## COUNT I
## NEGLIGENCE AS TO DEFENDANT LOANCARE
### (On Behalf of Plaintiffs and the Classes)

212.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if fully set forth herein.

213.    Defendant LoanCare requires its customers to provide their non-public PII as a condition of obtaining loan subservicing.

214.    Defendant LoanCare gathered and stored the PII of Plaintiffs and Class Members as part of its business, which affects commerce.

215.    Plaintiffs and Class Members entrusted Defendant LoanCare with their PII with the understanding that the information would be safeguarded.

216.    Defendant LoanCare had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if their PII were wrongfully disclosed.

217.    By assuming the responsibility to collect and store this data, Defendant LoanCare had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

218.    Defendant LoanCare owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

219.    Defendant LoanCare also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII they were no longer required to retain pursuant to regulations.

220.    Moreover, Defendant LoanCare had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach but failed to do so.

221.    Defendant LoanCare had and continues to have duties to adequately disclose that Plaintiffs' and Class Members' PII within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

222.    Defendant LoanCare breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII. The specific negligent acts and omissions committed by Defendant LoanCare include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.  Failing to adequately monitor the security of their networks and systems;

c.  Allowing unauthorized access to Class Members' PII;

d.  Failing to detect in a timely manner that Class Members' PII had been
compromised;

e.  Failing to remove former customers' PII they were no longer required
to retain pursuant to regulations; and

f.  Failing to timely and adequately notify Class Members about the Data
Breach's occurrence and scope, so that they could take appropriate
steps to mitigate the potential for identity theft and other damages.

223.  A breach of security, unauthorized access, and resulting injury to
Plaintiffs and Class Members was reasonably foreseeable, particularly in light of
Defendant LoanCare's inadequate security practices.

224.  It was foreseeable that Defendant LoanCare's failure to use
reasonable measures to protect Class Members' PII would result in injury to Class
Members. Further, the breach of security was reasonably foreseeable given the
known high frequency of corporate cyberattacks and data breaches.

225.  Defendant LoanCare had full knowledge of the sensitivity of the PII
and the types of harm that Plaintiffs and Class Members could and would suffer
if the PII were wrongfully disclosed.

226.  Plaintiffs and Class Members were the foreseeable and probable
victims of any inadequate security practices and procedures. Defendant LoanCare

knew or should have known of the inherent risks in collecting and storing PII, the

critical importance of providing adequate security of that PII, and the necessity for

encrypting PII stored on its systems.

227.   It was foreseeable that Defendant LoanCare's failure to adequately

safeguard PII would result in one or more types of injuries to Class Members.

228.   Plaintiffs and Class Members had no ability to protect their PII that

was in, and possibly remains in, Defendant LoanCare's possession.

229.   Defendant LoanCare was in a position to protect against the harm

suffered by Plaintiffs and Class Members as a result of the Data Breach.

230.   Defendant LoanCare's duties extended to protecting Plaintiffs and

Class Members from the risk of foreseeable criminal conduct of third parties,

which have been recognized in situations where the actor's own conduct or

misconduct exposes another to the risk or defeats protections put in place to guard

against the risk, or where the parties are in a special relationship. *See* Restatement

(Second) of Torts § 302B. Numerous courts and legislatures have also recognized

the existence of a specific duty to reasonably safeguard personal information.

231.   Defendant LoanCare has admitted that the PII of Plaintiffs and Class

Members was wrongfully lost and disclosed to unauthorized third persons as a

result of the Data Breach.

232.    But for Defendant LoanCare's wrongful and negligent breach of duty owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' PII would not have been compromised.

233.    There is a close causal connection between Defendant LoanCare's failure to implement security measures to protect Plaintiffs' and Class Members' PII, and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. PII was lost and accessed as the proximate result of Defendant LoanCare's failure to exercise reasonable care by adopting, implementing, and maintaining appropriate security measures.

234.    As a direct and proximate result of Defendant LoanCare's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant LoanCare's possession and is subject to further unauthorized disclosures so long as Defendant LoanCare fails to undertake appropriate and adequate measures to protect the PII; (viii) future costs

in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized access to their PII permitted by Defendant LoanCare; and (xi) any nominal damages that may be awarded.

235.    As a direct and proximate result of Defendant LoanCare's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

236.    Additionally, as a direct and proximate result of Defendant LoanCare's negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant LoanCare's possession and is subject to further unauthorized disclosures so long as Defendant LoanCare fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

237.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

## COUNT II
## NEGLIGENCE AS TO DEFENDANT FNF
### (On Behalf of Plaintiffs and the Classes)

238.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if fully set forth herein.

239.    Defendant FNF requires its customers to provide their non-public PII as a condition of obtaining loan subservicing.

240.    Defendant FNF gathered and stored the PII of Plaintiffs and Class Members as part of its business, which affects commerce.

241.    Plaintiffs and Class Members entrusted Defendant FNF with their PII with the understanding that the information would be safeguarded.

242.    Defendant FNF had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if their PII were wrongfully disclosed.

243.    By assuming the responsibility to collect and store this data, Defendant FNF had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

244.    Defendant FNF owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

245.    Defendant FNF also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII they were no longer required to retain pursuant to regulations.

246.    Moreover, Defendant FNF had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach but failed to do so.

247.    Defendant FNF had and continues to have duties to adequately disclose that Plaintiffs' and Class Members' PII within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

248.    Defendant FNF breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII. The specific negligent acts and omissions committed by Defendant FNF include, but are not limited to, the following:

    a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b. Failing to adequately monitor the security of their networks and systems;

    c. Allowing unauthorized access to Class Members' PII;

d. Failing to detect in a timely manner that Class Members' PII had been
compromised;

e. Failing to remove former customers' PII they were no longer required
to retain pursuant to regulations; and

f. Failing to timely and adequately notify Class Members about the Data
Breach's occurrence and scope, so that they could take appropriate
steps to mitigate the potential for identity theft and other damages.

249. A breach of security, unauthorized access, and resulting injury to
Plaintiffs and Class Members was reasonably foreseeable, particularly in light of
Defendant FNF's inadequate security practices.

250. It was foreseeable that Defendant FNF's failure to use reasonable
measures to protect Class Members' PII would result in injury to Class Members.
Further, the breach of security was reasonably foreseeable given the known high
frequency of corporate cyberattacks and data breaches.

251. Defendant FNF had full knowledge of the sensitivity of the PII and
the types of harm that Plaintiffs and Class Members could and would suffer if the
PII were wrongfully disclosed.

252. Plaintiffs and Class Members were the foreseeable and probable
victims of any inadequate security practices and procedures. Defendant FNF knew
or should have known of the inherent risks in collecting and storing PII, the critical

importance of providing adequate security of that PII, and the necessity for encrypting PII stored on their systems.

253.   It was foreseeable that Defendant FNF's failure to adequately safeguard PII would result in one or more types of injuries to Class Members.

254.   Plaintiffs and Class Members had no ability to protect their PII that was in, and possibly remains in, Defendant FNF's possession.

255.   Defendant FNF was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

256.   Defendant FNF's duties extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

257.   Defendant FNF has admitted that the PII of Plaintiffs and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

258. But for Defendant FNF's wrongful and negligent breach of duty owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' PII would not have been compromised.

259. There is a close causal connection between Defendant FNF's failure to implement security measures to protect Plaintiffs' and Class Members' PII, and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. PII was lost and accessed as the proximate result of Defendant FNF's failure to exercise reasonable care by adopting, implementing, and maintaining appropriate security measures.

260. As a direct and proximate result of Defendant FNF's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant FNF's possession and is subject to further unauthorized disclosures so long as Defendant FNF fails to undertake appropriate and adequate measures to protect the PII; (viii) future costs in terms of time, effort

and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized access to their PII permitted by Defendant FNF; and (xi) any nominal damages that may be awarded.

261.   As a direct and proximate result of Defendant FNF's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

262.   Additionally, as a direct and proximate result of Defendant FNF's negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant FNF's possession and is subject to further unauthorized disclosures so long as Defendant FNF fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

263.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

## COUNT III
## NEGLIGENCE *PER SE* AS TO LOANCARE
### (On Behalf of Plaintiffs and the Classes)

264.   Plaintiffs restate and reallege paragraphs 1 through 211 above as if fully set forth herein.

265.   Defendant LoanCare had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45 which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

266.   Defendant LoanCare violated Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant LoanCare's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the damages that would result to Plaintiffs and Class Members.

267.   Plaintiffs and Class Members were within the class of persons the provisions of the FTCA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statutes were intended to guard against.

268. Defendant LoanCare's violations of Section 5 of the FTCA constitute negligence *per se*.

269. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

270. In addition, Defendant LoanCare collects "nonpublic personal information," as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) & 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Defendant LoanCare was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq.*, and is subject to numerous rules and regulations promulgated under the GLBA.

271. Defendant LoanCare's conduct resulted in a variety of failures to follow GLBA mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that Defendant LoanCare failed to implement (or inadequately implemented) information security policies or procedures such as effective customer training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to protect the confidentiality of the PII they maintained in their information technology network.

272.    It was foreseeable that Defendant LoanCare's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations and financial institutions.

273.    Defendant LoanCare had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII was wrongfully disclosed.

274.    Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant LoanCare knew or should have known of the inherent risks in collecting and storing the PII, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on its systems.

275.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

276.    But for Defendant LoanCare's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the PII of Plaintiffs and Class Members would not have been compromised.

277.    As a direct and proximate result of Defendant LoanCare's negligence *per se*, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant LoanCare's possession and is subject to further unauthorized disclosures so long as Defendant LoanCare fails to undertake appropriate and adequate measures to protect the PII; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized access to their PII permitted by Defendant LoanCare; and (xi) any nominal damages that may be awarded.

278.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

<u>**COUNT IV**</u>
**NEGLIGENCE *PER SE* AS TO FNF**
**(On Behalf of Plaintiffs and the Classes)**

279.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if fully set forth herein.

280.    Defendant FNF had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45 which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

281.    Defendant FNF violated Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant FNF's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the damages that would result to Plaintiffs and Class Members.

282.    Plaintiffs and Class Members were within the class of persons the provisions of the FTCA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statutes were intended to guard against.

283.    Defendant FNF's violations of Section 5 of the FTCA constitute negligence *per se*.

284.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

285.    In addition, Defendant FNF collects "nonpublic personal information," as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) & 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Defendant FNF was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq.*, and is subject to numerous rules and regulations promulgated under the GLBA.

286.    Defendant FNF's conduct resulted in a variety of failures to follow GLBA mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that Defendant FNF failed to implement (or inadequately implemented) information security policies or procedures such as effective customer training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to protect the confidentiality of the PII it maintained in its information technology network.

287.    It was foreseeable that Defendant FNF's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high

frequency of cyberattacks and data breaches at large corporations and financial institutions.

288.    Defendant FNF had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII was wrongfully disclosed.

289.    Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant FNF knew or should have known of the inherent risks in collecting and storing the PII, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on its systems.

290.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

291.    But for Defendant FNF's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the PII of Plaintiffs and Class Members would not have been compromised.

292.    As a direct and proximate result of Defendant FNF's negligence *per se*, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs

associated with attempting to mitigate the actual consequences of the Data Breach;

(v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails;

(vii) the continued and certainly increased risk to their PII, which: (a) remains

unencrypted and available for unauthorized third parties to access and abuse; and

(b) remains backed up in Defendant FNF's possession and is subject to further

unauthorized disclosures so long as Defendant FNF fails to undertake appropriate

and adequate measures to protect the PII; (viii) future costs in terms of time, effort

and money that will be expended to prevent, detect, contest, and repair the

inevitable and continuing consequences of compromised PII for the rest of their

lives; (ix) the present value of ongoing credit monitoring and identity defense

services necessitated by the Data Breach; (x) the value of the unauthorized access

to their PII permitted by Defendant FNF; and (xi) any nominal damages that may

be awarded.

293.    Plaintiffs and Class Members are entitled to compensatory and

consequential damages suffered as a result of the Data Breach.

## <u>COUNT V</u>
### BREACH OF IMPLIED CONTRACT AND
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiffs and the Classes)

294.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if

fully set forth herein.

295.   Plaintiffs and Class Members were required to provide their PII to Defendants as a condition of receiving loan subservicing.

296.   Plaintiffs and Class Members entrusted their PII to Defendants. In doing so, Plaintiffs and Class Members entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been breached and compromised or stolen.

297.   In entering into the implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

298.   Implicit in the agreement between Plaintiffs and Class Members and Defendants was Defendants' obligation to: (a) take reasonable steps to safeguard that PII; (b) prevent unauthorized disclosure of the PII; (c) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; (d) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses; and (e) retain or allow third parties to retain PII only under conditions that kept such information secure and confidential.

299.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendants on the other, is demonstrated by their conduct and course of dealing. Defendants required Plaintiffs and Class Members to provide their PII as a condition of mortgage loan subservicing. Plaintiffs and Class Members accepted the offers for services and provided their PII.

300.    In accepting Plaintiffs' and Class Members' PII, Defendants understood and agreed that they were required to reasonably safeguard and otherwise ensure protection of the PII from unauthorized access or disclosure.

301.    Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of the implied contract between them and Defendants that Defendants would keep their PII reasonably secure.

302.    Plaintiffs and Class Members would not have entrusted their PII to Defendants in the absence of their implied promise to monitor and ensure that the PII entrusted to it would remain protected by reasonable data security measures and remain confidential.

303.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendants by providing their PII at Defendants' request.

304.    Defendants breached the implied contracts made with Plaintiffs and Class Members by failing to safeguard and protect their PII, by failing to delete the

PII of Plaintiffs and Class Members once the relationship ended, and by failing to provide accurate notice to them that their PII was compromised as a result of the Data Breach.

305.  As a direct and proximate result of Defendants' breach of these implied contracts, Plaintiffs and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

306.  Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

307.  As alleged herein, when Plaintiffs and Class Members provided their PII to Defendants, they entered into implied contracts where Defendants agreed to comply with its duties and industry standards to protect PII and to timely detect and notify them in the event of a data breach.

308.  Plaintiffs and Class Members were required to provide their PII in exchange for mortgage loan subservicing with Defendants, as well as an implied covenant by Defendants to protect Plaintiffs' PII in its possession.

309.  It was clear by these exchanges that Plaintiffs and Class Members on one hand, and Defendants on the other, intended to enter into an agreement. Plaintiffs and Class Members would not have disclosed their PII to Defendants but in exchange for Defendants' loan servicing. Conversely, Defendants presumably

would not have collected Plaintiffs' and Class Members' PII if they did not intend to provide Plaintiffs and Class Members with the services they were offering.

310.   Implied in these exchanges was a promise by Defendants to ensure that PII of Plaintiffs and Class Members was only used in connection with the agreed-upon services.

311.   Plaintiffs and Class Members therefore did not receive the benefit of the bargain with Defendants, because they provided their PII in exchange for an implied agreement by Defendants to keep it safe and secure.

312.   While Defendants had discretion in the specifics of how they met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

313.   Defendants breached this implied covenant when they engaged in acts and/or omissions that are declared unfair trade practices by the FTCA, the GLBA, and state statutes and regulations. These acts and omissions included: omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Plaintiffs' and Class Members' PII; storing the PII of former customers, despite any valid purpose for the storage thereof having ceased upon the termination of the business relationship with those individuals; and failing to disclose to Plaintiffs and Class Members at the time they provided

their PII to it that Defendants' security systems failed to meet applicable legal and industry standards.

314.    Plaintiffs and Class Members did all or substantially all the significant things that the contract required them to do. Likewise, all conditions required for Defendants' performance were met.

315.    Defendants' acts and omissions unfairly interfered with Plaintiffs' and Class Members' rights to receive the full benefit of their contracts.

316.    Plaintiffs and Class Members have been or will be harmed by Defendants' breach of this implied covenant in the numerous ways described above, including actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cybercriminals have their PII, and the attendant long-term expense of attempting to mitigate and insure against these risks.

317.    Defendants are liable for its breach of these implied covenants, whether or not they are found to have breached any specific express contractual term.

318.    Plaintiffs and Class Members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorney fees, costs, and expenses.

<u>COUNT VI</u>
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Classes)**

319.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if
fully set forth herein.

320.    Plaintiffs and Class Members conferred a monetary benefit on
Defendants by providing them with their valuable PII.

321.    Defendants knew that Plaintiffs and Class Members conferred a
benefit upon them and accepted and retained that benefit by accepting and
retaining the PII entrusted to them. Defendants profited from Plaintiffs' retained
data and use Plaintiffs' and Class Members' PII for business purposes.

322.    Defendants failed to secure Plaintiffs' and Class Members' PII and,
therefore, did not fully compensate Plaintiffs or Class Members for the value that
their PII provided.

323.    Defendants acquired the PII through inequitable record retention as
it failed to disclose the inadequate data security practices previously alleged.

324.    If Plaintiffs and Class Members had known Defendants would not use
adequate data security practices, procedures, and protocols to adequately monitor,
supervise, and secure their PII, they would not have agreed to the entrustment of
their PII to Defendants.

325.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

326.    As a direct an proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized access to their PII permitted by Defendants; and (xi) any nominal damages that may be awarded.

327.    Plaintiffs and Class Members are entitled to restitution and/or damages from FNF and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by FNF from its wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

328.    Plaintiffs and Class Members may not have an adequate remedy at law against FNF, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Classes)**

329.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if fully set forth herein.

330.    Defendants became the guardian of Plaintiffs' and Class Members' PII. Defendants became fiduciaries, created by its undertaking and guardianship of Plaintiffs' and Class Members' PII, to act primarily for their benefit. This duty included the obligation to safeguard Plaintiffs' and Class Members' PII and to timely detect and notify Plaintiffs and Class Members in the event of a data breach.

331.    Defendants knowingly undertook the responsibility and duties related to the possession of Plaintiffs' and Class Members' PII for the benefit of

Plaintiffs and Class Members in order to provide Plaintiffs and Class Members loan subservicing.

332.   Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members within the scope of its relationship with them. Defendants breached their fiduciary duties owed to Plaintiffs and Class Members by failing to properly protect PII. Defendants further breached their fiduciary duties by failing to timely detect the Data Breach and notify and/or warn Plaintiffs and Class Members of the Data Breach.

333.   As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered or will suffer concrete injury, including, but not limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their PII is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII, which remains in Defendants' possession and is subject

to further unauthorized disclosures so long as it fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' PII in its continued possession; (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the PII compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (h) nominal damages.

334.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT VIII
## DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201 *et seq.*
### (On Behalf of Plaintiffs and the Classes)

335.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if fully set forth herein.

336.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Consolidated Class Action Complaint.

337.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injuries as result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future.

338.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants owe a legal duty to secure Plaintiffs' and Class Members' PII under the common law, the FTCA, the GBLA, and other state and federal laws and regulations, as set forth herein;

b.    Defendants' existing data monitoring measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect individuals' PII; and

c.    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs' and Class Members' PII.

339.    This Court should also issue corresponding prospective injunctive

relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect members' PII, including the following:

       a.     Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

       b.     Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security and monitoring measures, including, but not limited to:

       i.     prohibiting Defendants from engaging in the wrongful and unlawful acts alleged herein;

       ii.     requiring Defendants to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

       iii.     requiring Defendants to delete and purge the PII of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.      requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiffs' and Class Members' PII;

v.       requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis;

vi.      prohibiting Defendants from maintaining Plaintiffs' and Class Members' PII on a cloud-based database until proper safeguards and processes are implemented;

vii.     requiring Defendants to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendants' systems;

viii.    requiring Defendants to conduct regular database scanning and securing checks;

ix.      requiring Defendants to monitor ingress and egress of all network traffic;

x.       requiring Defendants to establish an information security training program that includes at least annual information

security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiffs and Class Members;

xi.    requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xii.    requiring Defendants to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendants' networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii.    requiring Defendants to meaningfully educate all Class Members about the threats that it faces because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

340.    If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach of Defendants' systems. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

341.    The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. The cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal duty to employ such measures.

342.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach of Defendants' systems and network, thus preventing future injury to Plaintiffs and other members whose PII would be further compromised.

343.    Following the issuance of the declaratory relief requested herein, Plaintiffs and Class Members will seek any further necessary or proper relief, including damages, after reasonable notice and hearing, against Defendants.

## COUNT IX
### CALIFORNIA UNFAIR COMPETITION ACT
### Cal. Bus. & Prof. Code §§ 17200 *et seq.*
### (On Behalf of Plaintiffs Arrowsmith, Bat, Gharibian, and Peralta and the
### California Subclass)

344.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if
fully set forth herein.

345.    Plaintiffs Gregory Arrowsmith, Namuun Bat, Andre Gharibian, and
Jose Peralta (for the purposes of this section, "Plaintiffs") bring this claim on behalf
of themselves and the California Subclass.

346.    Defendants are "persons" as defined by Cal. Bus. & Prof. Code §
17201.

347.    Defendants violated Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")
by engaging in unlawful, unfair, and deceptive business acts and practices.

348.    Defendants' "unfair" acts and practices include:

a.      Defendants failed to implement and maintain reasonable
security measures to protect Plaintiffs' and California Subclass Members'
PII from unauthorized disclosure, release, data breaches, and theft, which
was a direct and proximate cause of the Data Breach;

b.      Defendants failed to identify foreseeable security risks,
remediate identified security risks, and sufficiently improve security
following previous cybersecurity incidents, as alleged herein. This conduct,

with little if any utility, is unfair when weighed against the harm to Plaintiffs and California Subclass Members, whose PII has been compromised;

c.    Defendants' failure to implement and maintain reasonable security measures also was contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTCA, 15 U.S.C. § 45, the GLBA, 15 U.S.C. § 6801 *et seq.*, California's Consumer Records Act, Cal. Civ. Code § 1798.81.5, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100;

d.    Defendants' failure to implement and maintain reasonable security measures also resulted in substantial consumer injuries, as alleged above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not have known of Defendants' grossly inadequate security, consumers could not have reasonably avoided the harms that Defendants caused; and

e.    Defendants engaged in unlawful business practices by violating Cal. Civ. Code § 1798.82.

349.    Defendants has engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82

(requiring timely breach notification), the FTCA, the GLBA, and California common law.

350. Defendants' unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and California Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and California Subclass Members' PII, including duties imposed by the FTCA and the GLBA, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and California Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and

California Subclass Members' PII, including duties imposed by the FTCA and the GLBA;

f.    Omitting, suppressing, and concealing the material fact that it did not properly secure Plaintiffs' and California Subclass Members' PII;

g.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and California Subclass Members' PII, including duties imposed by the FTCA, the GLBA, California's Consumer Privacy Act, Cal., and California's Customer Records Act, which was a direct and proximate cause of the Data Breach; and

h.    Failing to provide the Notice of Data Breach required by Cal. Civ. Code § 1798.82(d)(1).

351.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

352.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiffs and California Subclass Members were injured and suffered monetary and non-monetary damages, as alleged herein, including but not limited to fraud and identity theft; time and expenses related to

monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach.

353.    Defendants acted intentionally, knowingly, and maliciously to violate California's UCL, and recklessly disregarded Plaintiffs' and California Subclass Members' rights.

354.    Plaintiffs and California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices or use of their PII; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT X
### CALIFORNIA CONSUMER RECORDS ACT
### Cal. Civ. Code §§ 1798.80 *et seq.*
### (On Behalf of Plaintiffs Arrowsmith, Bat, Gharibian, and Peralta and the California Subclass)

355.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if fully set forth herein.

356.    Plaintiffs Gregory Arrowsmith, Namuun Bat, Andre Gharibian, and Jose Peralta (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the California Subclass.

357.    "[T]o ensure that PII about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains PII about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the PII [PII] from unauthorized access, destruction, use, modification, or disclosure."

358.    Defendants are businesses that own, maintain, and license PII (or "PII"), within the meaning of Cal. Civ. Code §§ 1798.80(a) and 1798.81.5(b), about Plaintiffs and California Subclass Members.

359.    Plaintiffs' and California Subclass Members' PII includes "PII" as covered by Cal. Civ. Code § 1798.82.

360.    Businesses that own or license computerized data that includes PII are required to notify California residents when their PII has been acquired (or is reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach

notification must include "the types of PII [PII] that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

361.    Because Defendants reasonably believed Plaintiffs' and California Subclass Members' PII was acquired by unauthorized persons during the Data Breach, Defendants had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

362.    Defendants failed to fully disclose material information about the Data Breach, including the types of PII impacted.

363.    By failing to disclose the Data Breach in a timely and accurate manner, Defendants violated Cal. Civ. Code § 1798.82.

364.    Defendants also violated Cal. Civ. Code § 1798.82 by not publishing a notice of data breach in the format required by Cal. Civ. Code § 1798.82(d)(1).

365.    As a direct and proximate result of Defendants' violations of the Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and California Subclass Members suffered damages, as alleged above.

366.    Plaintiffs and California Subclass Members seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

## COUNT XI
## CALIFORNIA CONSUMER PRIVACY ACT
### Cal. Civ. Code §§ 1798.100 *et seq.*
### (On Behalf of Plaintiffs Arrowsmith and Peralta and the California Subclass)

367.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if fully set forth herein.

368.    Plaintiffs Gregory Arrowsmith and Jose Peralta (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the California Subclass.

369.    Plaintiffs and California Subclass Members are residents of California.

370.    Defendants are companies organized or operated for the profit or financial benefit of its owners. Defendants collect consumers' PII as defined in the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.140.

371.    Defendants violated § 1798.150 of the CCPA by failing to prevent Plaintiffs' and California Subclass Members' nonencrypted PII from unauthorized access and exfiltration, theft, or disclosure as a result of Defendants violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

372.    Defendants have a duty to implement and maintain reasonable security procedures and practices to protect Plaintiffs' and California Subclass Members' PII. As detailed herein, Defendants failed to do so.

373.    As a direct and proximate result of Defendants' acts, Plaintiffs' and California Subclass Members' PII, including names, addresses and Social Security numbers, was subjected to unauthorized access and exfiltration, theft, or disclosure.

374.    Plaintiffs and California Subclass Members seek injunctive or other equitable relief to ensure Defendants hereinafter properly safeguards customer PII by implementing reasonable security procedures and practices. Such relief is particularly important because Defendants continue to hold customer PII, including Plaintiffs' and California Subclass Members' PII. Plaintiff and California Subclass Members have an interest in ensuring that their PII is reasonably protected.

375.    A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendants and third parties with similar inadequate security measures.

376.    Plaintiffs and California Subclass seek actual damages, as well as all monetary and non-monetary relief allowed by law, including actual financial losses; injunctive relief; and reasonable attorneys' fees and costs.

377.    Pursuant to Cal. Civ. Code § 1798.150(b), Plaintiffs Arrowsmith and Peralta each mailed CCPA notice letters to Defendants' registered service agents,

detailing the specific provisions of the CCPA that Defendants have violated and

continues to violate.

378.    To date, Defendants have taken no action to remedy its misconduct

or otherwise address the violations outlined in the written notice sent by Plaintiff

Peralta's counsel.

379.    Plaintiffs and the California Subclass seek actual damages, as well as

all monetary and non-monetary relief allowed by law, including actual financial

losses; injunctive relief; reasonable attorneys' fees and costs; and statutory

damages.

<u>**COUNT XII**</u>
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 501.201** *et seq.*
**(On Behalf of Plaintiffs Freire and Turizo and the Florida Subclass)**

380.    Plaintiffs restate and reallege paragraphs 1 through 211 above as if

fully set forth herein.

381.    Plaintiffs Richard Freire and Ryan Turizo (for the purposes of this

section, "Plaintiffs") bring this claim on behalf of themselves and the Florida

Subclass.

382.    Plaintiffs and Florida Subclass Members are "consumers" as defined

by Fla. Stat. § 501.203.

383.    Defendants advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

384.    Defendants engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1), including:

    a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Florida Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b.    Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Florida Subclass Members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45, the GLBA, 15 U.S.C. § 6801, and Florida's data security statute, F.S.A. § 501.171(2), which was a direct and proximate cause of the Data Breach;

d.      Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs 'and Florida Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e.      Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Florida Subclass Members' PII, including duties imposed by the FTCA, the GLBA, and Florida's data security statute, F.S.A. § 501.171(2);

f.      Omitting, suppressing, and concealing the material fact that it did not properly secure Plaintiffs' and Florida Subclass Members' PII; and

g.      Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Florida Subclass Members' PII, including duties imposed by the FTCA, the GLBA, and Florida's data security statute, F.S.A. § 501.171(2).

385.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

386.    Had Defendants disclosed to Plaintiffs and Florida Subclass Members that their data systems were not secure and, thus, were vulnerable to attack,

Defendants would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law. Defendants were trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiffs and Florida Subclass Members. Defendants accepted the responsibility of protecting the data but kept the inadequate state of its security controls secret from the public. Accordingly, Plaintiffs and Florida Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

387.    As a direct and proximate result of Defendants' unconscionable, unfair, and deceptive acts and practices, Plaintiffs and Florida Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non- monetary damages, as alleged herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach.

388.    Plaintiffs and Florida Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages under Fla. Stat. §

501.211; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other Class Members, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A.    Certifying the Classes as requested herein, designating Plaintiffs as class representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.    Awarding Plaintiffs and the Classes appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, nominal damages, and disgorgement;

C.    Awarding Plaintiffs and the Classes equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and Class Members, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.    Awarding Plaintiffs and the Classes pre-judgment and post-judgment interest to the maximum extent allowable;

E.     Awarding Plaintiffs and the Classes reasonable attorneys' fees, costs, and expenses, as allowable; and

F.     Awarding Plaintiffs and the Classes such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Consolidated Class Action Complaint so triable.

Dated: March 19, 2024.                    Respectfully submitted,

/s/ Mariya Weekes
Mariya Weekes FBN 56299
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Tel: (786) 879-8200
mweekes@milberg.com

Bryan Bleichner (*pro hac vice*)
Philip J. Krzeski (*pro hac vice*)
**CHESTNUT CAMBRONNE PA**
100 Washington Ave. S, Suite 1700
Minneapolis, MN 55401
Tel: (612) 339-7300
bbleichner@chestnutcambronne.com

*Plaintiffs' Interim Co-Lead Counsel*

Raina Borelli (*pro hac vice
forthcoming*)
**TURKE & STRAUSS LLP**
613 Williamson Street, Suite 201
Madison, WI 53703
Tel: (608) 237-1775
raina@turkestrauss.com

Mark S. Reich (*pro hac vice
forthcoming*)
**LEVI & KORSINKSY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
mreich@zlk.com

A. Brooke Murphy (*pro hac vice
forthcoming*)
**MURPHY LAW FIRM**
4116 Will Rogers Pkway, Suite 700
Oklahoma City, OK 73108
Tel: (405) 389-4989
abm@murphylegalfirm.com

Kelly Hyman FBN 0719021
**HYMAN LAW FIRM, P.A.**
515 North Flagler Drive, Suite P-300
West Palm Beach, Florida 33401
Tel: (561) 538- 9050
kellyhyman@thehymanlawfirm.com

Robert W. Murphy FBN 717223
**ROBERT W. MURPHY ESQ.**
440 Premier Circle, Suite 240
Charlottesville, VA 22901
Tel: (434) 328-3100 / (954) 763-8660
rwmurphy@lawfirmmurphy.com

Gary E. Mason (*pro hac vice* forthcoming)
**MASON, LLP**
5335 Wisconsin Avenue NW
Suite 640
Washington, DC 20015
Tel: (202) 429-2290
gmason@masonllp.com

Francesca K. Burne FBN 1021991
**MORGAN & MORGAN PA**
201 Franklin St.
Tampa, FL 33602
Tel: (813) 229-4027
fburne@forthepeople.com

Patrick Donathen (*pro hac vice* forthcoming)
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
patrick @lcllp.com

Jeff Ostrow FBN 121452
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 332-4200
ostrow@kolawyers.com

*Plaintiffs' Executive Committee Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served via email via the CM/ECF system on all counsel of record on this 19th day of March, 2024.

_/s/ Mariya Weekes_____
Mariya Weekes